The fourth case of the day, U.S. v. Sweeney. Mr. Patton Good morning, Your Honors. My name is Tom Patton and I represent the appellant, Eugene Sweeney. We believe that the district judge erred when he refused to suppress the gun that was found in the basement of Mr. Sweeney's apartment. We also challenge the sentence that was imposed, arguing both that the district court erred when he found that Mr. Sweeney was an armed career criminal, but also finding that the district judge erred. He imposed the sentence before this court issued its opinions in Thomson and Kappus, and we assert that the judge erred in imposing the standard conditions of supervised release without giving reasons for them and using language that this court has squarely held cannot stand. I'd like to focus on the suppression issue, if I could. Okay, and can you begin with sort of the layout of the building, because there are no photos, no diagrams or anything that, like, set everything out. And the building, the officers came in, was the door open when they came in? It was a six-unit? It's a six-story unit. When you go in the front door, you can get to the apartments, but you cannot get to the basement through the area you access by going in the front door. Right, and then the front door was open when the officers came in? Their testimony was that it was propped open by either somebody moving in or moving out. At the back of the unit, there is a back door that you go into, or you can go into. You also can get to that – there's a landing when you come in that door. That – there's also staircases. When you walk in, there's a hallway, and then there's – it's two sets of three that go up. So I understand that people that live there cannot use those premises for storage. The landlord or the manager, the property manager, said that they discourage people from storing items down there, mainly because they don't want people – their fear is that people are storing it down there. There's people going in and out from the various apartments, too, are there not? The basement is absolutely accessible to the other people, the people that live in all the apartments. So your expectation of privacy would be almost minimum, would it? Yes, and we're not arguing in this case on a reasonable expectation of privacy, but I think the important issue is that this court has clearly held for years that there is no reasonable expectation of privacy in the common areas of an apartment building. Right. But given the Supreme Court's decisions in Jones and Jardinez, we now know that if there is a trespass into a Fourth Amendment-protected area for the purpose of searching for evidence, that is a Fourth Amendment violation. Whether you have a reasonable expectation of privacy – A violation? Pardon me. Go ahead. Who can raise it? That was my question. Okay. Well, you – the individual – I didn't mean to speak the same way, did I? The individual asserting, challenging the search, of course, has to have – Has to have an expectation of privacy. I would disagree with that characterization, Judge Barofsky, even if you look at – Well, you can. I mean, you're entitled to. Well, you look in Jardinez. Jardinez involved the police taking a drug dog onto somebody's front porch. Now, you have a reasonable expectation of privacy in the sense that it's the curtilage of your house, but there's not a reasonable expectation of privacy in the sense of that what is happening on your front porch is secret and private, that other people can't see it. You know, clearly other people can see it. You know, people can come up and knock on your door. So it's not that it's secret, that nobody else can see it. It's just it is part of the home that has Fourth Amendment protection. It's not about secrecy and saying nobody else can see what's happening here. It's this is part of my home and that somebody's front yard is part of the curtilage of their home. If they're standing out in their front yard and visiting with people, what they're doing isn't secret, isn't private in the nature of that – No, but they have the right to exclude somebody, and that's why it would be trespass. Correct. But let's go back to Judge Bower's question, and that is would – have had any right to assert a claim for trespass for someone going into the basement of this building since he had no right to exclude anyone? I believe he would not have the ability to try and exclude anyone who was a resident of the apartment or was an invitee of the other residents in the apartment. That's just a function of living in a multi-unit apartment building, that there are other people. But certainly he had the right to access that area. He had a legal right. Let's go back to my question. Could he have sued anyone for trespass? I think he could have. Based on what? Based on, say somebody comes into that basement and goes into that room, turns his water heater off, turns the main breaker to his apartment off. For his apartment, okay. That's not what happened. Does he have the right to exclude somebody who just comes in and sleeps overnight down in the basement? Does he have the right to exclude them? Does he have the right to sue them for trespass? I think he does have the right to say you can't – to exclude them based on his – the manager of the apartment building agreed that the – all the occupants have access to that area, have to be given access to that area. You're building your argument, in essence, on the common law of trespass, right? Yes. Based on Jardines and Jones. So, building from the common law of trespass, does somebody in Mr. Sweeney's position have the power to sue for trespass in these circumstances, and if so, why? Judge Edelman cited state law cases out of Indiana and a state law case out of Seattle indicating that a property owner could assert a – Property owner. Or the – a apartment owner. Now, in the Indiana case, it was more activity that was occurring right outside the door of the apartment – the person's apartment, so not in a separate basement. Right. Not in a separate basement where it was a common area where there was really no door, no lock, no anything. Yes. Well, the general public – there were locks keeping the general public out. Well, to everybody's apartment. Well, and even into the basement area. And then once you came into the apartment, but once you were in the apartment, you could go down to that common area, and anybody who was a guest of somebody in an apartment could go down there. Anybody who was a guest, yes. And I agree with that, but I think the point is simply because there are other people that are – and can be invited in. The question is, can he – does he have the right to exclude other apartment residents or their invitees? Does he have a right with regard to the general public to try and keep them out? And I think that he could. I think he could call the – I think if he called the police and said there's somebody in our apartment building that's down in the basement, that is sleeping down in the basement, I want him out of there, that – Well, he could make that call, but then could he sue? Could he sue the person who's down there? That's what Judge Hamilton is trying to press for the case. I understand. I'm looking not for your instincts. I'm looking for common law authority that would support your interpretation of the Fourth Amendment. I do not have a case, Your Honor, that supports that. You want at least the ground to be broken right here. It's a perfectly appropriate position to take. I think because I think that – Hard to do, but I mean – Because we've gotten very used to thinking in reasonable expectation of privacy terms because of caps. And Jones and Jardins has said, look, that's not – that's still part – one part of the equation. But we have these property rights – there is a property rights base to the amendment as well. And the people that live in apartment buildings shouldn't – they're going to have less privacy rights than if somebody lives in a single family home. But they don't have zero. And especially if they live in a building that is secured, where the doors are locked to try and keep – The question is what rights they have to the common areas. Yes, absolutely. I mean – Okay. Sure. At least we know what we're talking about. Right. And for – but even when those common areas are not accessible to the general public, where the doors, the access to that common area is limited to somebody who's invited in or one of the residents, then yes, I think it extends to that part. If you live in a building where the doors aren't locked, where anybody, any member of the public can walk in – Oh, you've established what you're trying to do. Anything else? I think the fact that they have to, by law, give him access to that area. The landlord could not exclude Mr. Sweeney from that area. If he did, he would be in violation of the Milwaukee City Codes of Ordinances. So he has to be given access to that. So that gives him a property right in that portion of the basement because it has his electrical breaker boxes. That's what triggers the right under the Milwaukee City Code. And this evidence that was found was not found in the area of – or was it in the area of his breaker box? It was not – when you walk into the basement, when you walk down to the steps, you literally are facing a wall. I've been in there. I went and looked. What were you doing there? It's in Milwaukee and I was at the Judicial Conference, so it's just a couple of blocks from the – Didn't have a search warrant or anything? No, but I got one of the people to let me in. Yeah. If you stand outside and start – If you stand out long enough and look pitiful enough, they'll let you in. And especially if you start taking pictures, people will come out and ask you what you're doing. Why, did anybody come out and ask you or are you just guessing they might if you said they're – Oh, no, they did. They let him in. Like, how are you doing here? He has a friendly, safe – It started the way you said, what the hell are you doing here? And went to – when I explained to them who I was, they knew Mr. Sweeney and so they let me go in. And we admire your initiative. Yes. So when you get to the bottom of the stairs and turn left, there's a doorway into an open room. The breaker boxes run right along the wall that's to your right. The hot water heaters are directly to your left along the wall that – on the other side of the wall is the stairs. You come down. You walk down past the six water heaters and then there's an area underneath the stairs. And then where was the gun in that? In the area underneath the stairs. Under the steps. You walk past the water heaters and they're under the steps. And that was the testimony as to where it was located. Okay. But the landlord and the property manager, and he testified to this at the hearing in front of Judge Adelman. And he said, by law, we have to give them access to this area. And it's true. The Milwaukee Code says you've got to give them access to that. And I do – since he has a legal right to be there, in fact, cannot legally be excluded from being in that area, he should have the right – he has a right to do that. And there's no question that Officer Gasser – I'm sorry, I don't know exactly how to pronounce it. He went down there to specifically look for evidence. And so if that area is part of the curtilage of his home, then it would violate the Fourth Amendment under Jardins and Jones. Can I ask you about the armed career criminal act issue, Mr. Patton? Yes, sir. My question is, why should we conclude – well, first of all, you agree we're under a plain-error standard review on this, right? Yes. And why is it so clear that a categorical approach that's used under different statutory language would be applied to juvenile crimes? I think for the reasons that the Supreme Court gives for adopting the categorical approach, number one, it protects a person's Sixth Amendment right. Now, I know in juvenile adjudications you don't have a right to a jury finding of fact beyond a reasonable doubt on the elements of the offense. But even in the juvenile adjudication, you have a due process right to have the finder of fact find each element of the offense. And I know it's not a perfect transition from the adult to juvenile. What I'm focusing on is the different statutory language between an offense and an act. And I understand that. But a juvenile adjudication still has to be based on a judge's finding of fact that the person violated whatever statute the juvenile is accused of violating. You have to find those elements beyond a reasonable doubt. But that's the only – those are the only issues that the trier of fact is required to find beyond a reasonable doubt. And part of – one of the main animating factors behind the categorical approach is to protect the right of saying that this issue that now we're saying we can look at as historical fact, that those facts were decided in compliance with due process. Not that we're going to go back under a – at a federal sentencing hearing using a preponderance of the evidence standard and just go back through the record and me as a federal – as a fact finder years and years later say, I find as a matter of fact that this – the offense involved this fact. And so part of that was when the Supreme Court adopted the categorical approach in Taylor, it was based on that, hey, this conviction – the only thing the conviction establishes beyond a reasonable doubt are the elements required for that offense. And so, Judge Hamlin, I understand that the language when they talk about an act of juvenile delinquency involving a knife, gun, or destructive device is different language than when they talk about – has as an element the use or attempted or threatened use of physical force. But you need that protection because otherwise you're letting somebody's – you're increasing the punishment based on a fact that was not necessarily found by the fact finder beyond a reasonable doubt. Let me just be as transparent as I can about my concern here. That's a good argument. We have not held in a precedential decision that that is correct as a matter of juvenile acts used to support armed career criminal designations. We're applying a plain error standard. One of the things I've got to worry about is whether, in essence, an affirmance would seriously affect fairness, integrity, or public reputation of the judicial proceedings, but a reversal here is essentially asking us to disregard facts that seem to have been undisputed in the district court as to what actually happened. I understand the reasons for the categorical approach, but I'm troubled by the argument that a plain error standard would require us to close our eyes to every indication that Mr. Sweeney did physically threaten a witness and was involved in an armed robbery where the other fellow in fact pulled out a gun. I understand the concerns. I have to go under plain error because that's the way I found the record. Now, as a practical matter, I think that the sentence is going to have to be vacated on the issue of conditions of supervised release. I'm not convinced of that. I don't see a whole lot of point in sending this back to Judge Adelman simply to read the standard conditions of supervised release to your claim. Well, you're right. They'd have to do substantial change to the language of those conditions, too, because the language of the conditions is the language that Thompson and Kappus and numerous opinions have said is bad. For example, it's got the language of the probation. Thompson and Kappus, however, are very difficult to reconcile with a lot of our other cases dealing with waiver and waiver of appellate rights and typical plain error standards. Well, there was no appeal waiver here because there was a trial. There was no plea. And I understand that there are members of this court that disagree with the remedy that Thompson and Kappus, but I cite the Sewell case. It's a virtual carbon copy up here where the judge has said he's got to follow the standard, 15 standard conditions, and the court said it's plain error and it has to go back for a full resentencing. But as far as your concern about the fairness and the integrity of the proceedings, when you look and you think there were unconsistent facts that seemed to show that there was a knife involved and that there was threat. There was a gun and there was no objection to the pre-sentence report here. The categorical approach is absent. The only thing that's clear about the categorical approach is that you cannot base the decision, and I would submit any part of the decision, based on what you believe the actual facts of the offense were. So we could have a situation where a juvenile is accused of murdering someone, but without one of the enumerated weapons, was not charged as an adult. Could that conviction support the ACCA enhancement? Not if it doesn't have as an element that there was a firearm, knife, or a destructive device. And I would say that's no more strange a conclusion than if the person committed a murder by picking up a brick and hitting somebody over the head. Then no matter how much of facts you can look at, that's not going to be a violent felony under ACCA. For a juvenile. For a juvenile, right, yes. Because it's not going to involve – so you're always going to have some of it in just the strangeness of, well, if you kill somebody by beating them with a baseball bat instead of shooting them, it's not going to be a violent felony under the juvenile. So that exists completely separate from the question of whether you use a categorical approach. And as complicated as it is to apply the categorical approach, if you start then saying we're going to use a different rule when it comes to juvenile adjudication. In this case, we can simply say it's an open question. Yes. And therefore, it was not a plain error. Yes, you can say that. All right, thank you. Mr. Johnson, and we'll give you extra time if you need it. Thank you. May it please the Court, my name is Mel Johnson. I'm an assistant U.S. attorney from Milwaukee, and I represent the United States today in this appeal. Regarding the defendant's suppression argument, I think it's important to clearly state the government's position, which Judge Adelman adopted, and it was alluded to in the questioning of Mr. Patton. That is that the defendant is not entitled to suppression of the gun, magazine, and ammunition found in the basement of his apartment building because those items were found in a place where he had no protected Fourth Amendment interest. The defense relies on the trespassory theory of the Fourth Amendment, as described by the Supreme Court in Jones and Jardines, but that theory does not entitle the defendant to suppression because the trespassory theory goes to whether there was a violation of the Fourth Amendment. But the defendant's problem is that even if we assume that there was a violation of the Fourth Amendment, his rights were not violated because he had no Fourth Amendment protected interest in that basement, so the defendant is not entitled to suppression. And that was made clear by the Supreme Court in earlier cases, Carter and Rakes, which are mentioned in the government's brief, and the essence of the reason those were cited in the brief is their holding that only a defendant whose Fourth Amendment rights have been violated can benefit from the exclusionary rules protections. You know, there's the obvious example. If someone illegally searches your house and finds evidence that incriminates me, even if it was a violation of the Fourth Amendment, I don't have any ability to suppress that evidence because it wasn't my Fourth Amendment rights that were violated, and that's essentially what we have here. That's not Eugene Sweeney. So who had rights in that basement? Well, as far as the Fourth Amendment goes, I would say that the evidence presented at the evidentiary hearing would lead me to believe maybe nobody had any Fourth Amendment rights in that basement. Not even the landlord? Well, perhaps the landlord, but the testimony was very consistent with sort of well-accepted principles that I discussed in the brief. That is, tenants in a multi-unit apartment building have no expectation of privacy in common areas of the building. Common areas include shared basements. These common areas, including the basements, are not part of an apartment's curtilage, and that's exactly what the evidence at the evidentiary hearing here indicated. Well, you're going back to the expectation of privacy theory that the defense wants to get away from here. Can you talk to us about the common law of trespass? Yes. As far as the trespass goes, you know, you asked could Mr. Sweeney have sued someone for trespass. I'd be lying if I told you I was an expert in trespass law, but my reaction to your question is that Mr. Sweeney's remedy, if any, would be to call the landlord and say you need to take some action. There's a guy sleeping in our basement, and he's not a tenant here. I'd like him out. Same question. I appreciate your instincts. Each of you have instincts in response to this question that support your side of the case, but some authority would be nice. I'd be lying if I told you I had anything more than my instincts. Okay. In any event, I put this in terms of Mr. Sweeney's lack of a protected Fourth Amendment interest because maybe that's a better way to put it than expectation of privacy, although they tend to address the same sort of concerns. To get back to the evidence which was presented, which I think addresses the question about whether anybody's Fourth Amendment rights were violated, the building contained six apartments. All of them had access to the basement. The defendant had no control over anyone else's access to the basement. To respond to a question that was asked earlier, there was no lock on the basement. In other words, anyone could have gone down from any of the apartments to go into the basement. The defendant lived in apartment four, which was two floors away from the basement. There was no area in the basement associated with any apartment, including the area where the gun was found. Mr. Patton's correct that it was found beyond the water heaters in an area kind of under the stairway. There were no storage areas for any apartment in the building, and the landlord testified at the evidentiary hearing that he prohibited tenants from storing anything down in the basement. The landlord testified that the back door to the building was supposed to be locked. However, he admitted that he was only at the building about once a month. Mr. Sweeney, who lived there every day, testified that all sorts of people had access to the basement. Mr. Sweeney testified that the back door was often unlocked. Sometimes it was propped wide open with a board or a rock. What Mr. Sweeney referred to as the public had access to the basement. He said there was a lot of traffic going in and out of the basement. There were shared laundry facilities in the basement. According to Mr. Sweeney, those laundry facilities were used by people from the neighborhood who didn't even live there. He didn't even know when he saw people in the basement whether they even had permission from any tenant to be there. This basement was as common as any area gets, and the defendant had no Fourth Amendment interest there to protect. Beyond the fact that Jones and Jardines are beside the point in that sense, they're plainly distinguishable. Jones held that the placement of a GPS tracker on the defendant's car was a search under the Fourth Amendment because the car was, in effect, covered by the Fourth Amendment. The Fourth Amendment refers to searches of persons, houses, papers, and effects. Jardines held that taking a drug-sniffing dog onto the porch of a house was also a Fourth Amendment search because the house was clearly covered by the Fourth Amendment. Now, in contrast, in this case, this was a search in a common basement of a multi-unit apartment building. There was no basis for Mr. Sweeney or anyone else to expect privacy in that basement. It was not the search of a person, house, paper, or effect. So, Mr. Johnson, could the police have just broken open an unlocked door to search that basement without violating Mr. Sweeney's Fourth Amendment rights? Yes. Now, they might have been subject to civil suit. In other words, there may have been other remedies, but the remedy would not have been suppression of evidence. Well, not by him. But help me out as to how the defense cited Justice Jackson's concurrence in the McDonald case some years ago where the police had broken into a boarding house, managed to shush the landlady so she wouldn't alert the guys who were running the numbers racket and peeked in over the transom. The Supreme Court threw out that conviction. And Justice Jackson's opinion does seem to suggest pretty strongly that there are some Fourth Amendment interests that tenants have in those common areas, at least if the police are doing something like breaking in. Well, I suppose that case also involved looking into, correct me if I'm wrong, looking into the departments themselves over the transoms. So I think that that may be a different case because the police act of breaking into the building was being used in order to commit what I think we would probably agree was a Fourth Amendment search in the sense that they're looking into the living area. That's not true here. To move on to the armed career criminal. But can you get to the special conditions first, and then we'll get to armed career criminal because I know we have some questions there. Okay. There were standard conditions imposed on Sweeney. Many of them were identical to the ones found improper in Thompson. And you agree the judge didn't really clarify these conditions. How can we uphold them in light of Thompson? Well, I think you can uphold them for several reasons. First of all, as was noted earlier, the defense has to demonstrate plain error here because there was no objection to any of the conditions. And harmless error can even apply here, as Kappus acknowledged. The judge's failure to perfectly explain his reasons can be harmless error, and Kappus also noted that a generally adequate statement of reasons is sufficient. Now, Judge Adelman did actually provide quite a bit of explanation if you go through the transcript. He stated that he considered the factors under 18 U.S.C. section 3553A, the common sentencing factors. He noted some of them that he thought were relevant to Mr. Sweeney's case. He referred to the purposes of sentencing. Yeah, but in terms of being tied to these special conditions. Well, he did generally say that he was on purpose. But he wasn't specific. Yeah. That's not our record. It's not there. Yeah, he didn't specify the standard conditions. On the other hand, I don't think that that requires reversal because of plain error, because of harmless error, because of the fact that the standard conditions are well known in the criminal justice system and are not really the subject of, you know, I'm not saying I'm the oldest or best lawyer in the world, but I've been practicing criminal law for 40 years. I don't ever recall any criminal defendant quibbling or raising questions about these standard conditions, that is the conditions required by 3583D and also the conditions that this court has on other occasions said are administrative requirements that are, in a way, taken for granted. All right. Can you move then to the armed career criminal? Certainly. Certainly. Of course, a person is sentenced as an armed career criminal if he is a felon in possession of a firearm and has three prior violent felonies. Judge Edelman found that Mr. Sweeney had four of them. Here on appeal, the defense concedes that two of them are valid. That is a burglary and a robbery. But the defense argues that two others should not have been counted. One was a juvenile armed robbery. The other was intimidation of a witness. So it's important to remember that to prevail on this issue, the defense argument must succeed as to both of those contested prior offenses, and the defense argument cannot succeed on either. The task is made more difficult by the fact that the defense did not object to the armed career criminal determination at sentencing. So this is reversible error only if it was plain error under the criteria set out in the Puckett case by the Supreme Court and also mentioned by this court in the Kyra case in 2013. They were alluded to, at least some of them, earlier. But you agree, and he's a juvenile, and the use of a firearm, knife, or destructive device wasn't there, wasn't part of the charge, well, wasn't the statute, wasn't. You mean where they mentioned in the statute? Right. Well, not directly, but indirectly. The Wisconsin armed robbery statute is a so-called divisible statute. That is, it can be violated in various ways, and the use of a gun is one of the ways that that can be done. And so when you have a divisible statute, it's appropriate to use the modified categorical approach, which is also applicable to juvenile offenses. I cited some cases for that proposition on page 42 of my brief. And so in using that modified categorical approach, when there's various ways to violate the statute, the court can look at court records such as charging documents, plea agreements, jury instructions, and so forth, to see which aspect of a divisible statute the defendant violated. Consistent with that modified categorical approach, this court has repeatedly upheld sentencing courts' reliance on the description of the offense in an unchallenged pre-sentence report. So if we take this approach now and apply it to this first challenge prior conviction, that is the juvenile armed robbery, it's clearly a violent felony. Well, the statute was a general robbery statute, right? The Wisconsin statute, not an armed robbery statute? Well, the subsection 1, it's section 943.32 of the Wisconsin statutes. Subsection 1 defines robbery, but then subsection 2 defines armed robbery, and it refers to use or threat of use of a dangerous weapon, a device or container referred to under a different statute, which refers, I think, to things that are not relevant here. So there are several ways in which... How is that a divisible statute, though, where a whole range of types of dangerous weapons will suffice for that statute, but the government doesn't have to prove any particular one? Well, but they have to prove one, and they have to prove was it a dangerous weapon, or under Wisconsin law, was it a device or container described under section 941.264A, or any article used or fashioned in a manner to lead the victim reasonably to believe it's a dangerous weapon or such a device or container. So there's various ways in which that could be violated. I would also note, and I think it's really significant as to this juvenile offense, and I want to disagree with something that Mr. Patton said. He said that use of a firearm had to be an element of the offense. I don't believe that that's a fair reading of the definition of violent felony as it applies to juvenile offenses, because as to juvenile offenses, the federal statutory definition of violent felony refers to any act of juvenile delinquency involving the use or carrying of a firearm, knife, or destructive device that would be punishable by imprisonment for such term if committed by an adult. So if you have a violent offense committed by a juvenile, that offense need not, as an element, involve a firearm, knife, or destructive device because the definition says involving the use or carrying of a firearm, knife, or destructive device, and there's no doubt about that here. The unchallenged pre-sentence report describes this as an offense based on the petition, which is the juvenile charging document. I see my time is up. Unless you want me to finish the thought. Go ahead and finish the thought. This will be the last thing I'll say. The petition referred to in the pre-sentence report, that's paragraph 39 of the pre-sentence report, under Wisconsin law, the petition is the juvenile charging document. That petition, which can be relied upon under the case authority from this court, indicates that the defendant and an accomplice entered a store and brought merchandise to the counter. When they got there, the accomplice pulled a gun and put it into the face of an employee. But that's assuming we adopt the categorical approach, correct? Looking at the underlying charge and the facts. I may be splitting hairs, but I would call this the modified categorical approach. Although perhaps that's not even necessary because of the language I pointed out. It can be a third approach for juveniles, is the argument you're making. Well, because the use of the term involving, I think, is contrary to Mr. Patton's argument that as an element, that the underlying offense has to have as an element the use of a firearm, knife, or destructive device. Unless you have any other questions, my time is up. Thank you very much. I'll give you one minute in rebuttal. On the conditions of supervised release, I would submit that as the law currently stands in this circuit, this case has to be remanded for a full resentence. How is your client harmed? I didn't see any effort to show that he was harmed by the arguable errors in supervised release. The overbroad conditions that this court... And it's not just my opinion that they're overbroad. The conditions that this court has set that allow for home visits at any time. The condition that requires him to answer all questions truthfully by the probation office without carving out any exception to him not having to incriminate himself. As written, they could force him to incriminate himself. As written, they could come to his house every day at 3 o'clock in the morning if they wanted to. Why isn't it sufficient since those conditions can be modified at any time? Why isn't that sufficient protection for him so we can worry about this in some 20 years when he gets out? Because saying that you may have... You can ask the court to change the unconstitutional conditions doesn't cure the unconstitutional condition. It just doesn't. That doesn't mean that the condition as imposed violated the Constitution. And I see no way you can distinguish this from Thompson or Kappus or Sewell. And I think the court would have to sit on bonk and come to a conclusion to change the remedy that this court has said it should apply when the conditions are imposed in this way. Sewell is a literal carbon copy of this case. The judge said he has to comply with the standard. That had the standard 15 conditions. This had standard 13 conditions. They're completely indistinguishable. And unless the court on bonk changes the remedy for the violations of supervised release, I think it has to go back. Yeah, it's plain error, but the plain error standard applies the law as it stands at the time of this appeal. And there have been a legion of cases from the time this sentence was imposed in December of 2014 through now that just clearly established that these conditions are wrong under a plain error standard. All right. Thank you, Mr. Patton. The case will be taken under advisement.